RICKEY A. VOLPE *et al.*, Plaintiffs-Appellants, v. IKO INDUSTRIES, LTD., Defendant-Appellee (Automatic Switch Company *et al.*, Defendants).

First District (4th Division)   No. 1—00—2396

Opinion filed January 24, 2002.

568

Robert B. Patterson, Ltd., of Chicago (John F. Hedrich and Robert B. Patterson, of counsel), for appellants.

Cremer, Kopon, Shaughnessy & Spina, L.L.C., of Chicago (Paul P. Pobereyko, of counsel), for appellee.

PRESIDING JUSTICE HOFFMAN delivered the opinion of the court:

The plaintiffs, Rickey A. Volpe and Kathleen Volpe, appeal from circuit court orders: granting summary judgment in favor of the defendant, IKO Industries, Ltd. (Industries), on their complaint seeking recovery under a strict product liability theory; granting Industries' motion to strike the opinion testimony of their expert, William Cruice; and denying their motions for leave to file an amended complaint to allege an action in negligence. For the reasons that follow, we affirm.

Before analyzing the issues presented, we will set forth a brief recitation of the factual and procedural history of this case.

Industries is engaged in the business of manufacturing shingles and other roofing materials at a plant located in Brampton, Ontario. It is a privately held corporation owned by the Koschitzky family. The Koschitzky family either owns or controls additional roofing material manufacturing corporations in Canada and the United States, including IKO Chicago, Inc. (IKO Chicago), located in Bedford Park, Illinois.

The plaintiff, Rickey A. Volpe (Volpe), was employed as an oxidizer tank operator by IKO Chicago. On August 1, 1994, while at work, Volpe sustained severe burn injuries when an oxidizer tank erupted and spewed hot asphalt down upon him. An oxidizer tank prepares asphalt for use in the manufacture of shingles. The process is as follows. A raw material called "flux" is pumped from a storage tank into an oxidizer tank. Once in the oxidizer tank, the flux is heated to a high temperature by a super heater. Then, ferric chloride, a water based additive, is injected into the flux and air is blown from the bottom of the tank through the flux. The introduction of heat and air into the tank causes an exothermic chemical reaction, whereby the flux is transformed into asphalt, which is then applied to either dry felt or fiberglass to make shingles.

Sometime prior to 1990, IKO Chicago's general manager, Art Friedson, and its plant manager, Nelson Dunne, decided that the plant needed a second oxidizer tank. The second oxidizer tank is at the center of this controversy. David Koschitzky, the president of IKO Chicago, instructed his employees to consult John Evans, Industries' manager of corporate engineering, whenever new equipment or a modification of existing equipment was needed at the IKO Chicago

plant. Andrew Soward, Industries' controller, explained at his deposition that Industries became involved whenever IKO Chicago wanted to make a capital improvement because of the expertise of Industries' employees. He further stated that Industries' employees assisted IKO Chicago with such projects because of the commonality of ownership among the companies. In accordance with this policy, IKO Chicago employees consulted Evans regarding the purchase and installation of the second oxidizer tank for the plant. Evans visited the IKO Chicago facility to inspect the oxidizing yard and the area where the second tank was to be constructed. He subsequently ordered the second oxidizer tank from O'Connor Tanks, Ltd. (O'Connor Tanks), a custom fabricator of tanks located in Scarborough, Ontario. O'Connor Tanks had previously manufactured tanks for the various Koschitzky manufacturing companies.

Mitchell Moneta, an IKO Chicago plant engineer, testified at his deposition that Evans informed him that the second tank would be the same as the existing one. He further testified that Evans approved the specifications for the oxidizer tank. In contrast, Evans testified at his deposition that he only called O'Connor Tanks to obtain a price quote for an oxidizer tank. He stated that he did not provide the specifications for the tank; rather, O'Connor Tanks already had a set of specifications from a prior purchase of an oxidizer tank by Industries. He did not know who sent those specifications. Isaac Shaposhnik, O'Connor Tank's operation manager, testified at his deposition that O'Connor Tanks does not design tanks; rather, every tank is built to the customer's specifications. His testimony was corroborated by Don Malcolm, the general manager of O'Connor Tanks. Malcolm testified at his deposition that Industries would send O'Connor Tanks a drawing of the tank that it wanted fabricated and that Evans had final approval of the specifications. According to Malcolm, the oxidizer tank was simply a container when it left O'Connor Tanks. He stated that O'Connor Tanks had nothing to do with process piping installed on the tank. He further testified that O'Connor Tanks did not share profits from the fabrication of the tank with any Koschitzky corporate entity.

Sometime after the second oxidizer tank was installed at IKO Chicago, but before the accident resulting in Volpe's injuries, IKO Chicago's general manager, Reynold Hagle, decided to inject waste oil into the oxidizer tank during the oxidation process as a means of disposing of such waste. The waste oil tank accumulates material, including water, from pollution control devices throughout the IKO Chicago plant. Hagle testified at his deposition that he decided to modify the oxidation system to allow for the transfer of material from

the waste oil tank into the oxidizer tank so that the material would burn off during the oxidation process. The waste oil entered the air line outside the oxidizer tank and was blown into the tank along with air. IKO Chicago employees or outside contractors modified the oxidation system in this manner.

Volpe testified at his deposition that, when he arrived at work the afternoon of August 1, 1994, Joe Taylor, a coworker, informed him that the plant had experienced a power outage earlier in the day. Taylor also stated that they were in the middle of a "blow" when the power went out so that the oxidizer tank was full of flux. The temperature inside the tank was 475 degrees at the time. All other parts of the oxidation system were off and all of the valves related to the operation of the tank were shut. Volpe testified that, when Taylor finally restarted the system several hours later and opened the blower valve, the oxidizer tank was rumbling more than usual and the vents on the "knock out box," which is used to vent fumes from the super heater, were blowing open and shut, indicating a tremendous amount of pressure. Shortly thereafter, the rupture disks on top of the oxidizer tank blew and hot asphalt spewed out of the rupture openings onto Volpe, causing serious burn injuries. According to Volpe, after the accident, Jim Meehan, an IKO Chicago maintenance mechanic, stated that he thought the valve of the waste oil tank was left in the open position the whole time that the oxidation system was not operational, allowing waste oil to flow freely into the oxidizer tank.

On July 24, 1996, Volpe and his wife, Kathleen Volpe, filed a complaint against Industries and numerous other defendants, alleging product liability claims and a claim for loss of consortium against each defendant. We note that the plaintiffs voluntarily dismissed the complaint against certain defendants and that the trial court entered summary judgment in favor of all remaining defendants, including Industries. The plaintiffs appeal only from the summary judgment entered in favor of Industries.

The plaintiffs' complaint alleged, *inter alia*, that Industries "purchased, shipped and/or sold" an oxidizer tank from O'Connor Tanks, for "delivery and use" at IKO Chicago. According to the complaint, at the time the oxidizer tank was designed, manufactured, sold, and distributed into the stream of commerce, it was in a defective and unreasonably dangerous condition because it lacked an adequate means of relieving pressure which was likely to build up during the use of the tank and because it lacked a means of deflecting the contents of the tank away from people in the event the tank became overpressurized during use.

In answers to Supreme Court Rule 213(g) (177 Ill. 2d R. 213(g))

interrogatories, the plaintiffs identified William Cruice as an expert opinion witness who would testify at trial. According to those answers, Cruice would testify that the oxidizing tank was unreasonably dangerous for its intended use in that it failed to contain a mechanism to deflect material which might foreseeably escape the oxidizer through the rupture openings to an area unoccupied by workers.

At his deposition, Cruice testified that he has a masters degree in chemistry and is also a member of the American Institute of Chemical Engineers. According to Cruice, he has had experience with tanks which have rupture disks, although those tanks were not used for oxidizing. Cruice had "never seen an oxidizer tank and asphalt tank in [his] life other than the one that [he] went to see in Chicago." Although he acknowledged that the suggested deflector device would have to be of sufficient strength so as to withstand any force that would be applied against it as material erupted from the oxidizer tank, he admitted that he had not done any calculations to determine how strong the deflector would have to be. He did not have any drawings or plans of a deflector device intended for use on an oxidizer tank. Notwithstanding, he maintained that it would be feasible to install such a device. According to Cruice, a mechanical engineer would do the calculations to determine the anticipated forces against the deflector and then design a deflector that would withstand those forces. He was unaware of any industry standard, governmental regulation, or custom or practice in the industry that would be violated by the absence of a deflector device around the rupture openings.

Cruice further testified that the eruption of the rupture disks on top of the oxidizer tank and the discharge of asphalt that occurred at the time of Volpe's accident was the result of the introduction of water through the pipe from the waste oil tank to the oxidizer tank. He opined that there was a defect in the configuration of the piping between the waste oil tank and the oxidizer tank. Specifically, the pipe from the waste oil tank drained into the air line from the blower. As a result, during the power outage on the day of the accident, a large quantity of water from the waste oil tank drained into the air line and accumulated behind the blower valve. Thus, when the blower valve was opened, a large amount of waste material was blown into the oxidizer tank. The water immediately changed to steam and the oil vaporized due to the high temperature of the flux inside the tank. The rapid expansion in volume due to the transformation of water to steam caused the flux to pile up and burst through the rupture disks on top of the tank and rain down to the ground around the tank. According to Cruice, the water that caused the eruption could only have come from the waste oil tank. He opined that, absent the introduction of

water from the waste oil tank, the eruption of asphalt from the oxidizer tank would not have been possible.

In contrast to Cruice's testimony, Industries' expert, Dirk Duffner, a mechanical engineer, testified at his deposition that the original design, fabrication, installation, and operation of the oxidizer tank was proper and in compliance with industry standards. He further opined that a rupture disk on a tank is meant to release a build up of gas, not asphalt. He explained that a deflector device around the rupture openings would not be feasible because, in the event of over-pressurization of the tank or an internal explosion, the deflector device might be blown off the tank due to the force of the explosion or the device might block the release of gases. According to Duffner, explosions are unpredictable and therefore it is difficult to determine the forces associated with them, thereby rendering the design of a deflector device around the rupture openings not feasible.

On March 3, 2000, Industries filed a motion for summary judgment, arguing, *inter alia*, that it could not be held liable because an alteration of the oxidizer tank caused Volpe's injury, to wit: the addition of waste oil during the oxidation process; and that there was no evidence to justify the imposition of strict liability on Industries because there was no evidence that it either provided the specifications for the oxidizer tank or reaped a profit from the sale of the tank to IKO Chicago. Industries further argued that the claim for loss of consortium must fail because such a claim is dependent on establishing Industries' liability for Volpe's injury.

Contemporaneously with the filing of its motion for summary judgment, Industries filed a motion to strike the expert opinion testimony of Cruice on the grounds that he was of the wrong professional discipline and, therefore, not qualified to render an opinion regarding the oxidizer tank's design. Specifically, Industries argued that Cruice, a chemist/chemical engineer, admitted that a mechanical engineer would be needed to do the calculations to reach a conclusion regarding the actual feasibility of designing a deflector device to be placed around the rupture openings. Further, Cruice stated that he had never designed or seen a design of such a deflector device. In fact, he had never seen an oxidizer tank. Industries also sought to strike Cruice's testimony which was critical of the piping configuration since the undisputed testimony established that the piping was added years after the oxidizer tank was originally designed and installed and that Industries had nothing to do with the alteration of the piping which allowed the transfer of material from the waste oil tank to the oxidizer tank.

In response to the motion for summary judgment, the plaintiffs

argued that Industries' "alteration" argument must fail because, although the contents of the oxidizer tank came under pressure due to the injection of waste oil through the modified piping, the reason the asphalt was able to injure Volpe was because it was not deflected once it exited the oxidizer tank. They further argued that Industries was liable under strict product liability theory because it participated in the design of the tank, it determined who the manufacturer would be, and its owners profited by an increased product output at the IKO Chicago plant.

With respect to the motion to strike Cruice's testimony, the plaintiffs argued that Cruice was qualified to render an expert opinion regarding the oxidizer tank at issue given his experience with tanks and vessels that hold chemicals, including petroleum products. They further argued that Cruice should be allowed to comment on the configuration of the piping because it affected the rate at which water entered the tank which explained why the eruption occurred.

While Industries' motion for summary judgment and motion to strike were pending, the plaintiffs filed an emergency motion for leave to file an amended complaint, wherein they asserted that discovery revealed that Industries provided the design specifications for the subject oxidizer tank to O'Connor Tanks. The record reflects that the plaintiffs did not attach a proposed pleading to their motion. However, the motion itself states that they sought to amend the complaint to add a claim of negligence on the part of Industries in the design of the tank and an additional claim of loss of consortium predicated on Industries' alleged negligence. On April 7, 2000, Judge Donald P. O'Connell denied the plaintiffs' motion, due to the prejudice to Industries that would result since discovery had been "virtually completed" and because Industries did not have an opportunity to explore the issues relevant to a negligence claim.

Subsequently, the plaintiffs filed an emergency motion to continue the trial date in this cause for the purpose of filing an amended complaint. To this motion, the plaintiffs attached a proposed two count amendment, wherein they alleged that Industries negligently: (1) designed the oxidizer tank; (2) designed, specified, and supplied the oxidizer tank without a reasonably adequate means of deflecting the emission of hot asphalt from the tank away from workers; (3) failed to provide reasonably adequate warnings and instructions to IKO Chicago regarding the proper installation of the tank given that Industries knew or should have known that the emission of hot asphalt from the tank was a foreseeable danger; and (4) failed to properly supervise the installation of the tank to ensure that any emission of hot asphalt from the tank would be contained or directed to an area to which

workers were denied access. The reason the plaintiffs sought leave to add the negligent installation allegation was based on Mitchell Moneta's testimony that Industries' employee, John Evans, oversaw the installation. Because Industries would be precluded from filing a motion for summary judgment on the negligence claims by Cook County circuit court rule 2.1(f) (Cook Co. Cir. Ct. R. 2.1(f) (eff. April 23, 1992)), which requires such motions to be filed at least 45 days prior to trial, the plaintiffs requested that the trial court exercise its discretion and continue the trial date to allow Industries to file a motion for summary judgment on the additional claims. Judge O'Connell denied the plaintiffs' motion on April 13, 2000.

On May 9, 2000, Judge Mary A. Mulhern heard oral argument on Industries' motion for summary judgment and motion to strike Cruice's testimony and, by a written order dated May 16, 2000, took the motions under advisement.

On June 5, 2000, the plaintiffs filed an emergency motion to reconsider the denial of their motion for leave to file an amended complaint. In that motion, they asserted that the trial of the case was continued to July 7, 2000, due to the unavailability of a material witness. Given the additional time, they asked the trial court to reconsider its previous denial and allow them to amend the complaint to add claims based on negligence and thereby conform the pleading to the evidence adduced during discovery. In an order dated June 5, 2000, Judge O'Connell set a briefing schedule on the motion and provided that the court's clerk would contact the parties once the court had reviewed the pleadings.

On June 12, 2000, Judge Mulhern entered a written order granting Industries' motion to strike Cruice's opinion testimony and granting summary judgment in favor of Industries. The trial court held that Cruice was not competent to testify that the lack of a deflector device around the rupture openings on the tank constituted a design defect because "he has neither designed nor seen designs for such a device and is unaware of any custom or practice in the industry or any industry or government standard requiring the installation of such a device." In granting summary judgment in favor of Industries, the trial court stated that, while the record indicated that Industries "may have been the source of the design specifications for the oxidizer tank at issue," there was no evidence that the design was defective.

On June 29, 2000, Judge O'Connell denied the plaintiffs' motion to reconsider the denial of their motion for leave to file an amended complaint predicated on the untimeliness of the motion and the prejudice that would inure to Industries. The trial court noted that the plaintiffs had ample notice that Industries was not the manufacturer

of the tank and had almost three years in which to amend the complaint adding its negligent design and installation allegations. It pointed out that Industries filed a motion to dismiss the complaint in May 1997, asserting that it was not the manufacturer of the tank and that, during the respective depositions of John Evans and Mitchell Moneta in June 1998 and April 1999, both testified regarding the manufacture and installation of the tank.

The plaintiffs filed a timely notice of appeal and present the following issues for our consideration: (1) whether the trial court erred in striking Cruice's expert opinion testimony; (2) whether summary judgment was properly granted in favor of Industries; and (3) whether the trial court should have granted the plaintiffs leave to amend their complaint to assert claims of negligence.

■ The plaintiffs first argue that the trial court erred by striking Cruice's opinion. The trial court has broad discretion in determining the admissibility of expert opinion testimony (*Schaffner v. Chicago & North Western Transportation Co.*, 129 Ill. 2d 1, 36, 541 N.E.2d 643 (1989)), and this court will not disturb such a ruling absent an abuse of that discretion (*Van Holt v. National R.R. Passenger Corp.*, 283 Ill. App. 3d 62, 70, 669 N.E.2d 1288 (1996)). On review, we conclude that striking of the plaintiffs' expert testimony evidence did not constitute an abuse of discretion.

■ The proponent of expert testimony has the burden of demonstrating to the trial court that the proffered opinion is worthy of admission into evidence. *People v. Jordan*, 103 Ill. 2d 192, 208, 469 N.E.2d 569 (1984). Specifically, the offering party must demonstrate that the witness is properly qualified as an expert based on his education, training, experience, or a combination of each (*People v. Novak*, 163 Ill. 2d 93, 104, 643 N.E.2d 762 (1994)), and that the witness' opinion is not based on speculation or conjecture (*Dyback v. Weber*, 114 Ill. 2d 232, 244, 500 N.E.2d 8 (1986)). In addition, the basis of the opinion must be reliable (*People v. Baynes*, 88 Ill. 2d 225, 240, 430 N.E.2d 1070 (1981)) and have gained general acceptance in accordance with *Frye v. United States*, 293 F. 1013, 1014 (D.C. Cir. 1923) (*People v. Miller*, 173 Ill. 2d 167, 187, 670 N.E.2d 721 (1996)).

In *Dyback*, 114 Ill. 2d 232, the plaintiff sued a home-construction business following a fire that damaged her home. She alleged that the fire was caused by the defendants' negligence in leaving a fuel-oil heater on the premises. A licensed public adjustor, who was qualified as an expert on causes and origins of fires and the valuation of losses produced by fires, "conceded that he did not know the cause of the fire[; however,] he stated his opinion that the fire would not have occurred if the heater had not been on the premises." *Dyback*, 114 Ill. 2d

at 237. On appeal, our supreme court affirmed the trial court's determination that the witness was unqualified to offer opinions on the duty of care the defendants owed because, in part, he conceded that he had "no idea" as to what ignited the fire. *Dyback*, 114 Ill. 2d at 244. As such, the adjustor's opinion was based on speculation.

█ Similarly, in *Dhillon v. Crown Controls Corp.*, 269 F.3d 865, 868 (7th Cir. 2001), the plaintiff sued the manufacturer of a forklift truck, alleging that the truck's design was defective because it did not have a rear door on the operator's compartment, which would have prevented his injury. The plaintiff's experts opined that the truck design was defective because it lacked a rear door; however, the experts did not design a prototype of a truck with a rear door or test such a model to determine whether it was both economically feasible and either as safe or safer than the model without the door. The trial judge ruled that the witnesses could not testify, and on appeal, the Seventh Circuit affirmed, concluding that "[o]f course, hands-on testing is not an absolute prerequisite to the admission of expert testimony, but the theory here easily lends itself to testing and substantiation by this method, such that conclusions based only on personal opinion and experience do not suffice." *Dhillon*, 269 F.3d at 870. Like *Dhillon*, the plaintiffs in the instant case offer an expert who opined, without building a prototype or conducting any tests, that a product was defective because it lacked an alternative design. Cruice admitted that he had not designed a deflector device of the type he testified should have been installed on the tank and had never seen such a device. Furthermore, he testified that a mechanical engineer would be needed to do the calculations necessary to reach a conclusion as to the feasibility of designing such a device. In our view, without either a model or test results, Cruice's opinion was unsubstantiated and speculative.

█ We next address whether the trial court correctly granted summary judgment in favor of Industries. In ruling on a motion for summary judgment, the court must consider the affidavits, depositions, admissions, exhibits, and pleadings on file and must construe them strictly against the movant and liberally in favor of the nonmoving party. *In re Estate of Hoover*, 155 Ill. 2d 402, 410-11, 615 N.E.2d 736 (1993). Summary judgment is appropriate when there is no genuine issue of material fact and the moving party's right to judgment is clear and free from doubt. 735 ILCS 5/2—1005(c) (West 1998); *Hoover*, 155 Ill. 2d at 410. Our review of the trial court's ruling on a motion for summary judgment is *de novo*. *Espinoza v. Elgin, Joliet & Eastern Ry. Co.*, 165 Ill. 2d 107, 113, 649 N.E.2d 1323 (1995).

█ Summary judgment in favor of a defendant is proper when a plaintiff cannot establish an essential element of his or her cause of

action. *Lavazzi v. McDonald's Corp.*, 239 Ill. App. 3d 403, 408, 606 N.E.2d 845 (1992). To prevail on a theory of strict product liability, a plaintiff must plead and prove, *inter alia,* that the injury or damage resulted from a condition of the product, that the condition was an unreasonably dangerous one, and that the condition existed at the time the product left the defendant's control. *Korando v. Uniroyal Goodrich Tire Co.*, 159 Ill. 2d 335, 343, 637 N.E.2d 1020 (1994).

■ Without Cruice's testimony, the record in this case is devoid of evidence establishing that the absence of a deflector device around the rupture openings on top of the oxidizer tank constituted a design defect. In fact, the only remaining evidence in the record is to the contrary. Industries' expert, Dirk Duffner, opined that the original design, fabrication, installation, and operation of the oxidizer tank was proper and in compliance with industry standards and that the design of a deflector device around the rupture openings was not feasible. Further, it is undisputed that, well after the oxidizer tank was originally designed and installed, either IKO Chicago employees or outside contractors modified the piping configuration of the system to allow for the injection of waste oil into the oxidation tank during the oxidation process. Because the plaintiffs failed to submit counter-evidentiary material to rebut this evidence, their claim of strict product liability must fail as there is no genuine issue of material fact on the question of whether the design of the oxidizer tank before it was altered by IKO Chicago was unreasonably dangerous. *Sorce v. Naperville Jeep Eagle, Inc.*, 309 Ill. App. 3d 313, 328-29, 722 N.E.2d 227 (1999).

We note that, on appeal, the plaintiffs also argue that the trial court should have granted them leave to file an amended complaint, alleging that Industries was negligent in designing and installing the tank and the system in which it was used. However, they concede that, if this court were to affirm the trial court's order striking the testimony of Cruice, there would be no basis upon which to reverse the order denying them leave to file an amended complaint. We agree.

■ Although courts are encouraged to freely and liberally allow pleadings to be amended (*Lee v. Chicago Transit Authority*, 152 Ill. 2d 432, 467, 605 N.E.2d 493 (1992)), litigants do not have an absolute right to file amended pleadings (*Strickland v. Communications & Cable of Chicago, Inc.*, 304 Ill. App. 3d 679, 686, 710 N.E.2d 55 (1999)). A trial court's ruling to allow or deny an amendment is a matter of discretion and will not be reversed absent an abuse of that discretion. *Hoover*, 155 Ill. 2d at 416. In determining whether a trial court's denial of a party's motion to amend constituted an abuse of discretion, we must consider: (1) whether the proposed amendment will cure the defective pleading; (2) whether the proposed amendment would

surprise or prejudice the opposing party; (3) whether the proposed amendment was timely filed; and (4) whether the movant had previous opportunities to amend. *Loyola Academy v. S&S Roof Maintenance, Inc.*, 146 Ill. 2d 263, 274-76, 586 N.E.2d 1211 (1992).

■ In this case, we find no abuse of discretion on the part of the trial court in denying the plaintiffs leave to file an amended pleading prior to the entry of summary judgment. Given that discovery was "virtually completed" and trial of the case was one month away, the trial court correctly concluded that Industries would suffer prejudice as a result of any amendment adding additional claims. Industries would not have had any time to investigate those claims, file a motion for summary judgment, or formulate a strategy for defending against those claims prior to trial. Second, as the trial court noted, the plaintiffs' motion was untimely. *Winter v. Henry Service Co.*, 143 Ill. 2d 289, 573 N.E.2d 822 (1991). The parties deposed John Evans in June 1998 and Mitchell Moneta in April 1999, both of whom testified regarding the design and installation of the subject oxidizer tank; yet, the plaintiffs did not seek leave to amend until April 2000. The plaintiffs offered no reason for this delay.

Further, we find no abuse of discretion in denying the plaintiffs leave to amend the complaint after Cruice's testimony was stricken and summary judgment was entered in favor of Industries. In order to recover on a theory of negligence, the plaintiffs would need to plead and prove that Industries owed them a duty of care, that Industries breached that duty, and that this breach was the proximate cause of Volpe's injuries. *Bier v. Leanna Lakeside Property Ass'n*, 305 Ill. App. 3d 45, 51, 711 N.E.2d 773 (1999). In their proposed amended complaint, the plaintiffs alleged, *inter alia*, that Industries breached its duty of care in that it negligently designed and installed the oxidizer tank because the tank did not have a reasonably adequate means of deflecting the emission of hot asphalt from the tank away from workers. However, as stated previously, without Cruice's testimony, the record in this case is devoid of evidence establishing that the absence of a deflector device around the rupture openings on top of the oxidizer tank constituted a design defect. The only remaining evidence in the record is to the contrary. Thus, the plaintiffs would not be able to establish any breach of duty on the part of Industries in the design or installation of the tank predicated on the absence of a deflector device. The same evidentiary material on file which supported summary judgment in favor of Industries on the plaintiffs' strict product liability claim would also support summary judgment in favor of Industries on their negligence claim. As such, there was no basis upon which to grant the motion to amend the complaint after summary judgment had been entered in favor of Industries.

Based on the foregoing, we affirm the orders of the trial court granting Industries' motion to strike the expert opinion testimony of Cruice, granting summary judgment in favor of Industries, and denying the plaintiffs leave to file an amended complaint.

Affirmed.

HARTMAN and THEIS, JJ., concur.